UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIAM MARK SCOTT, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ENTERPRISE FINANCIAL SERVICES CORP., et al., <br><br> Defendants. | Case No. 4:12CV00637 AGF |

# MEMORANDUM AND ORDER

Plaintiff William Mark Scott, a shareholder of Enterprise Financial Services Corp. ("EFSC"), brings this putative class action against EFSC, its Chief Executive Officer, Peter F. Benoist, and its Chief Financial Officer, Frank H. Sanfilippo, (collectively "Defendants"). Plaintiff alleges violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, arising from Defendants' alleged material misstatements regarding EFSC's results of operations for 2010 and 2011. Plaintiff specifically alleges that Defendants overstated interest income derived from distressed loans acquired as a result of the purchase of several failed banks.

Now before the Court is Defendants' motion to dismiss the amended class action complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, et seq. ("PSLRA"). This motion is fully briefed and, at the request of the parties, the Court also heard oral

argument on the motion. For the reasons set forth below, Defendants' motion shall be granted.

## BACKGROUND

Plaintiff alleges generally that Defendants engaged in a scheme to defraud investors in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, relating to the overstatement of income on distressed loans. With respect to § 10(b) and Rule 10b-5, Plaintiff alleges that Defendants misrepresented EFSC's net income, earnings per share ("EPS"), and net interest rate margin ("NIM"). Plaintiff alleges that these misstatements resulted in artificial inflation of EPS and share price. Plaintiff further alleges that due to Defendants' reckless conduct, they were required to issue a restatement of EFSC's financial results of operations that erased half of its earnings for six quarters spanning 2010 and 2011. Plaintiff contends that all members of the putative class, acting in reliance on the material misrepresentations, acquired the shares at an artificially high price and were damaged when the actual results of operations for the period in question were revealed.

Under § 20(a), Plaintiff alleges that the § 10(b) liability extends to Benoist and Sanfilippo, as EFSC's controlling parties, as a result of their high level involvement with the decisions at issue here, and on the basis of material misrepresentations made in the Sarbanes Oxley certifications filed during the relevant time period.

In the amended complaint, Plaintiff alleges the following facts. EFSC is the holding company of Enterprise Bank & Trust ("Enterprise Bank"), which provides banking and wealth management services to individuals and business customers located

in the St. Louis, Kansas City, and Phoenix metropolitan areas. Between December 11, 2009 and August 12, 2011, Enterprise Bank acquired four failed banks by way of Federal Deposit Insurance Corporation ("FDIC")-assisted transactions. In an FDIC-assisted transaction, "a bank purchases the assets of a failed bank as a whole business, at a discount, and the FDIC enters into a loss-sharing agreement with the acquiring bank to defray a good portion of the losses from the assumed loan portfolio." (Doc. No. 24.) The recognized accounting method for the calculation of interest income derived from an FDIC-assisted purchase of the assets of a failed bank is termed "ASC 310-30." ASC 310-30 requires the calculation of interest income using "cash flows expected at acquisition" as the reporting benchmark, and not the basic "contractually-required interest payments" reporting benchmark routinely used by EFSC.

Plaintiff contends that at the time that Enterprise Bank acquired its first failing bank in 2009, there already was "an entire field," including specialized software and consulting services, dedicated to the use of ASC 310-30 for reporting income derived from FDIC-assisted bank acquisitions. Plaintiff also alleges that EFSC's outside auditors offered similar specialized software and consulting services for these purposes during the relevant time period. In addition, Plaintiff alleges that during this same time period the FDIC advised EFSC's finance department about software packages EFSC could purchase for purposes of tracking and reporting interest income pursuant to FDIC requirements such as ASC 310-30.

During 2010 and 2011, EFSC "shopped for" and considered various specialized computer software packages to upgrade Enterprise Bank's financial reporting functions

3

and internal controls related to ASC 310-30. EFSC purchased and implemented such a system in January, 2012, at which time it discovered that, in addition to recording income on the loans from the FDIC-assisted transactions using the "cash flows expected at acquisition" benchmark under ASC 310-30, it also had simultaneously been recognizing the "contractually-required interest payments" reporting benchmark, in violation of Generally Accepted Accounting Principles ("GAAP"). Plaintiff alleges that as a result of Defendants' erroneous use of the "contractually-required interest payments" benchmark, they miscalculated the net income, EPS, and NIMs presented in its 2010 annual report, and for its March, June, and September 2010 and 2011 quarterly reports, respectively. This error resulted in significant overstatements of net income, EPS and NIM, for six quarters spanning 2010 and 2011.

On January 25, 2012, EFSC filed a report with the Securities and Exchange Commission (SEC) explaining that it had overstated its income due to the above-noted errors. EFSC also issued a press release on January 25, 2012, regarding its 2010 and 2011 financial statements that stated in pertinent part:

> Enterprise Financial Services Corp announced that it will restate its financial statements for the year ended December 31, 2010 and for the first three quarters of 2011 and 2010. The Company discovered an accounting error that resulted in an inadvertent overstatement of income on loans covered by FDIC loss share agreements during those periods. The Company has concluded that the Company's financial statements, report on internal controls and the reports thereon of Deloitte & Touche LLP, the Company's independent registered public accounting firm included in its Annual Report on Form 10-K as of and for the year ended December 31, 2010 and the interim financial statements included in its Quarterly Reports on Form 10-Q as of and for each of the periods ended March

> 31, June 30, and September 30, for 2010 and 2011, respectively, should no longer be relied upon.
>
> As a result of the restatement, based on current estimates, the Company expects diluted earnings per share for 2010 to between $0.20 and $0.25, compared to the originally reported earnings per share of $0.45.
>
> For the nine months ended September 30, 2011, the Company had previously reported net income of $24.8 million, or $1.46 per diluted share. After restating those results, based on current estimates, the Company expects to report net income of between $0.98 and $1.15 per diluted share for the period ending September 30, 2011 and between $1.20 and $1.35 per share for the year ended December 31, 2011.

(Doc. No. 1,¶ 32.)

On this news, EFSC's share price declined $2.92 per share, nearly 19%, to close on January 26, 2012, at $12.55 per share.

After promptly reporting the errors to the SEC, Defendants, acting pursuant to SEC directives, issued restatements of the results of financial operations for the six affected quarters. On April 23, 2012, Defendants issued restatements of net income, earnings per share, and net interest margins for its 2010 annual report, and for its March, June, and September 2010 and 2011 quarterly reports, respectively.

Plaintiff contends that Defendants' error could have been avoided by the "timely installation of the proper software and/or the institution of adequate internal controls over financial and FDIC reporting." (Doc. No. 24.) Plaintiff further alleges that as a result of the misstatements, EFSC's securities traded at artificially-inflated prices, which led class members to acquire EFSC's securities "relying upon the integrity of the market price . . .

5

and market information relating to [EFSC]," and to experience losses when the restated figures were released. *Id.* Plaintiff also alleges that Defendants' knowing delay in improving EFSC's processes and systems, and installing specialized software to comply with GAAP and the FDIC's reporting, constitutes severely reckless misconduct. Accordingly, Plaintiff argues that "Defendants should be held liable for investors' losses arising from such reckless disregard of accurate financial reporting." *Id.*

Specifically, Plaintiff asserts that the material misstatements of net income, EPS and NIM were recklessly made because EFSC began purchasing distressed bank assets in December 2009 without upgrading its accounting software and internal controls over financial reporting to ensure that EFSC could perform the complex calculations required by ASC310-30, make proper financial statement disclosures, and report to the FDIC. EFSC entered into three FDIC-assisted acquisitions, in December 2009, July 2010, and January 2011, without adequately upgrading EFSC's accounting software and internal controls over financial reporting to ensure that EFSC could perform the complex calculations required by ASC 310-30, make proper financial statement disclosures, and to report to the FDIC. Citing advice from the FDIC and Defendants' outside auditors and the availability and abundance across the industry of information regarding ASC310-30 compliance for FDIC-assisted purchases, Plaintiff asserts that Defendants' failure to acquire such software and implement ASC310-30 until January 2012 amounts to severe recklessness.

6

Plaintiff further notes that because Defendants increased the volume of loans in the Arizona operations from $30 million at the end of 2010, to $400 million in the first quarter of 2011, it was incumbent upon them to ensure that the EFSC had adequate infrastructure and systems to handle the substantially increased number of loans.

As factual support for these assertions, Plaintiff offers the testimony of confidential witnesses, former EFSC employees, to the effect that EFSC "shopped" for ASC310-30 compliant software throughout much of 2010 and 2011. In addition, Plaintiff alleges that a former employee who reviewed the relevant financial indices in the period prior to 2012 did not know whether the software Defendants were using during the relevant time period had the capability to report interest income in accordance with ASC310-30. In addition, Plaintiff asserts that current examination of the website for the maker of that software reveals that the software does not expressly refer to ASC310-30 functionality. (Doc. No. 24, ¶48)

Plaintiff further alleges that for four consecutive quarters, Defendants expressly attributed EFSC's strong financial results to interest income from the covered loan portfolio in Arizona. In light of the critical impact these loans had on EFSC's bottom line, Plaintiff contends that it was management's duty to verify the accuracy of those figures before reporting them and certifying them as correct. Plaintiff points out that Sanfilippo and Benoist expressly stated that absent the impact from the FDIC-assisted transactions, the NIM would have trended downward rather than upward, as reported. Plaintiff thus contends that because the bank acquisitions increased the NIM overall, reversing an apparent continued decline, Defendants should have further scrutinized the

NIM results to verify their accuracy before certifying them as correct. In addition, Plaintiff asserts that given the extreme importance to Defendants' earnings of the interest income stream generated from the Home National assets, management should have been extremely careful in reviewing the Home National loan figures to verify their accuracy before certifying them as correct.

Plaintiff also notes that at least one of the acquired banks generated interest income of significant importance to the EFSC's overall net income, and that EFSC's EPS exceeded in a single quarter the $0.15 to $0.20 value projected for the entire second half of 2010 causing EFSC to far exceed EPS estimates "by a wide margin." Therefore Plaintiff asserts that Defendants should have been alerted to the possibility of interest income calculation errors and further investigated the issue. Plaintiff also points out that in 2009 EFSC had experienced unrelated financial reporting errors due to inadequate internal controls and that this experience also should have instilled caution and caused them to examine carefully the reported figures, especially when they varied significantly from projected earnings.

## ARGUMENTS OF THE PARTIES

Defendants argue that the § 10(b) claim must be dismissed because the amended complaint does not state, with the requisite particularity, plausible allegations giving rise to a strong inference of scienter, a required element of any securities fraud claim.[1] Citing to Eighth Circuit precedent, Defendants maintain that neither the earnings restatements

---

[1] The Defendants raise only the issue of scienter in this motion and do not challenge the adequacy of Plaintiff's pleadings with respect to the other elements of his claims.

nor the GAAP violations alleged are sufficient to raise a strong inference of scienter, in the absence of corresponding allegations of fraudulent intent. Defendants further argue that Plaintiffs can show no more than an inference of inadvertent error because the alleged securities violations all arise from the same error, which was promptly corrected after its discovery. Defendants also maintain that neither the size of the overstatements nor the fact that they occurred over multiple quarters supports an inference of scienter because "Plaintiff presents nothing more than unsupported speculation and conclusory statements about Defendants' alleged knowledge of accounting violations." (Doc. No. 36.) Furthermore, Defendants argue that the ASC 310-30 rule is complex, and that its complexity supports an inference that it would have been difficult for Defendants to identify the accounting error merely from the results of the accounting calculations.

In response, Plaintiff concedes that neither allegations relating to the restatement of earnings and other indices nor a simple accounting error raise a sufficiently strong inference of scienter to survive a motion to dismiss. Nevertheless, Plaintiff asserts that he has adequately alleged scienter here, because he has alleged specifically that Defendants acted with severe recklessness and that they knew or should have known that the financial indices were false at the time they were reported.

Plaintiff further argues that Defendants' recklessness may be inferred from the magnitude, frequency, and nature of the required restatements and the industry attention on, and centrality of, the ASC 310-30 rule for proper handling of FDIC-assisted purchases. Plaintiff also maintains that the following factors: (1) significant income and earnings per share overstatements; (2) violations occurring over a string of consecutive

9

quarters; (3) multiple restatements in a short time period; (4) violations of a company's own internal policies; and (5) the simplicity of GAAP rule or internal policy violated, all alleged here, mandate a determination that Plaintiff has pled, with particularity, sufficiently strong inferences of severe recklessness to survive a motion to dismiss.

**STANDARD OF REVIEW**

I. **Motion to Dismiss**

In ruling on a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, even if it appears that "actual proof of those facts is improbable, and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562 (2007); Fed. R. Civ. P. 8(a) (2).

To survive a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). A plaintiff "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (citing *Twombly*, 550 U.S. at 555 & n. 3). This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. In addition, a complaint "must contain either direct or inferential allegations

respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562 (internal quotation omitted).

## II. <u>**Heightened Pleading Standard Applicable to "Scienter" under the PLSRA**</u>

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") to discourage abusive securities litigation by private parties. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007). "Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Id.* Specifically, with respect to the element of intent, the PSLRA provides that to survive a motion to dismiss, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b) (1)-(2); *see also Tellabs,* 551 U.S. at 313 (internal citation omitted) (holding that "[t]he PSLRA requires plaintiffs to state with particularity . . . the facts evidencing scienter, *i.e.,* the defendant's intention to deceive, manipulate, or defraud"); *In re Ceridian Corp. Securities Litigation*, 543 F.3d 240, 244 (8th Cir. 2008) (noting that "[s]trong means strong . . . and under the [PSLRA], it is not sufficient for the facts alleged to give rise to a weak or plausible inference of scienter").

To prevail on a claim of material misrepresentation or omission in violation of § 10(b) of the Exchange Act and the SEC's Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

11

causation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317-18 (2011) (internal citation omitted).

Scienter "can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Detroit Gen. Ret. Sys. v. Medtronic, Inc.,* 621 F.3d 800, 808 (8th Cir. 2010) (citation omitted). "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322-23. "[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 323. The United States Supreme Court has explained that:

> [t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 323-24.

### III. Pleading Requirements of Section 20(a) of the Securities Exchange Act

Section 20(a) of the Securities Exchange Act provides for a companion claim to §10(b), establishing the "liability of those who, subject to certain defenses, 'directly or indirectly' control a primary violator of the federal securities laws." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (quoting 15 U.S.C. § 78t(a)). Section 20(a) has been interpreted "as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable."[2] *Id.* at 873 (internal citation and quotation marks omitted). "The plain language of the control-person statute dictates that, absent a primary violation, a claim for control-person liability must fail." *Id.*

### DISCUSSION

Upon consideration of Plaintiff's allegations, the parties' briefs and argument as well as the applicable law, the Court concludes that Plaintiff's allegations regarding EFSC's misstatements of earnings and delayed implementation of the ASC 310-30 standards for reporting of interest income do not give rise to a sufficiently strong inference of scienter to survive a motion to dismiss.

---

[2] To prove a § 20(a) claim, a plaintiff must show:

> (1) that a primary violator violated the federal securities laws; (2) that the alleged control person actually exercised control over the general operations of the primary violator; and (3) that the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated.

*Lustgraaf*, 619 F.3d at 873 (internal citation and quotation marks omitted).

As noted above, under Eighth Circuit law "[p]roof of severe recklessness may establish the requisite scienter," and here Plaintiff contends that Defendants' misstatements were recklessly made. *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 766 (8th Cir. 2009) (citations omitted). Nonetheless, "[t]he Eighth Circuit has rejected the argument that accounting errors or restatements, in and of themselves, demonstrate scienter." *Rochester Laborers Pension Fund v. Monsanto Corp.,* 883 F. Supp. 2d 835, 896 (E.D. Mo. 2012). In order to demonstrate the requisite strong inference of severe recklessness, a plaintiff must allege "highly unreasonable omissions or misrepresentations amounting to an extreme departure from the standards of ordinary care, and [presenting] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* Upon careful review of the allegations in this case, the Court is satisfied that Plaintiff does not allege facts indicating that Defendants knew of the misrepresentations at issue. Moreover, the Court cannot agree with Plaintiff that the misrepresentations were so obvious that Defendants must have willfully ignored them.

In this regard the Court finds the reasoning set forth in *Ceridian* persuasive. In that case the defendant violated various GAAP principles and made multiple restatements of financial indices resulting from a variety of accounting errors. *Ceridian*, 543 F.3d at 246. The Court reasoned that "[a]llegations of GAAP violations are insufficient to state a securities fraud claim unless coupled with evidence of corresponding fraudulent intent." *Id.* (quoting *Kushner v. Beverly Enterprises, Inc.,* 317 F.3d 820, 831 (8th Cir 2003)). The Court further stated that "a showing in hindsight that the statements were false does not

demonstrate fraudulent intent." *Ceridian,* 542 F.3d at 248. "Without allegations of particular facts demonstrating how the defendants knew . . . the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it, a showing in hindsight that the statements were false does not demonstrate fraudulent intent." *Id.* (quoting *Kushner*, 317 F.3d at 827). For these reasons, the Eighth Circuit affirmed the district court's dismissal of the plaintiff's complaint, holding that "[w]ithout something more, the opposing inference of nonfraudulent intent—that there were mistakes by accounting personnel undetected because of faulty accounting controls—is simply more compelling." *Id.* at 246.

Here Plaintiff makes "a showing in hindsight that the statements were false," but fails to plead adequate facts to show "fraudulent intent," *i.e.* that Defendants knew EFSC's financial statements were false when issued. More crucially, Plaintiff also fails to raise a strong inference that the misstatements were so obvious that Defendants must have been aware of, or recklessly disregarded them. The statements of the confidential witnesses do not change this determination as they merely recount neutral facts, that Defendants sought throughout 2010 and 2011 to purchase a new software system, and apply hindsight to the assessment of the capability of the existing software.

That an accounting error existed does not raise an inference that Defendants knew or must have known of the error. *Id.* Plaintiff's allegations relating to the availability of specialized software and consulting services focused on ASC 310-30 implementation are insufficient to raise a strong inference of severe recklessness. *Id.* Nor do they permit the Court to conclusively infer that Defendants had reason to know of errors in their

15

accounting systems. Here, as in *Ceridian*, a plausible opposing inference of inadvertent "mistakes by accounting personnel [that went] undetected because of faulty accounting controls" is equally, if not more, persuasive. *Id.*; *see also Horizon Asset Mgmt*, 580 F.3d at 766 (holding that "a plaintiff must allege more than incompetence or corporate mismanagement" before a claim of negligence rises to the level of securities fraud) (citations omitted).

Plaintiff further argues that all factors permitting an inference of severe recklessness are present here: (1) significant income and earnings per share overstatements; (2) violations occurring over a string of consecutive quarters; (3) multiple restatements in a short time period; (4) violations of a company's own internal policies; and (5) simplicity of GAAP rule or internal policy violated. Although under *Tellabs,* 551 U.S. at 322-23, the Court considers these factors in combination, it also assesses the presence of each individually and the Court does not agree that all of the relevant factors are present here. Assuming that Plaintiff adequately alleges the first and second factors, the Court cannot conclude that Plaintiff has alleged the other three. Specifically, although Defendants issued two restatements over a period of three years, only the most recent was related to the allegations here. Nor has Plaintiff alleged an intentional violation of company policy or offered any factual basis from which the Court could infer that ASC 310-30 implementation is straightforward or simple.

In addition, the authorities Plaintiff cites in support of its position are primarily from other circuits and are distinguishable because, in addition to the factors set forth above, those cases included allegations of motive, such as insider trading. Here, Plaintiff

does not allege that Defendants had any motive, such as insider trading, to make false or misleading statements. "[W]ithout a showing of motive or opportunity, other allegations tending to show scienter . . . have to be particularly strong in order to meet the [PSLRA] standard." *In re K-tel Intern., Inc. Securities Litig.,* 300 F.3d 881, 894 (8th Cir. 2002). The Court cannot say that Plaintiff's allegations are "particularly strong." *Id*. They are largely premised upon hindsight and conduct that rises to the level of inadvertent error or negligence, but not severe recklessness. *Horizon Asset Mgmt*, 580 F.3d at 766 (quoting *Ceridian*, 542 F.3d at 249) (holding that "a plaintiff must allege more than 'incompetence' or corporate mismanagement before a claim of negligence rises to the level of securities fraud"). Accordingly, the Court concludes that Plaintiff's allegations regarding EFSC's earnings restatements and GAAP violations do not raise the required strong inference of scienter.

Having concluded that Plaintiff's § 10(b) claim fails, the Court also holds that the claims against the individual Defendants under § 20(a) must likewise be dismissed. "The plain language of the control-person statute dictates that, absent a primary violation, a claim for control-person liability must fail." *Lustgraaf*, 619 F.3d at 873; *see also In re Navarre Corp. Securities Litigation*, 299 F.3d 735, 748 (8th Cir. 2002) (holding that an actionable § 20(a) claim must be preceded by an actionable primary violation under § 10(b)).

## CONCLUSION

Because Plaintiff does not sufficiently allege scienter, Plaintiff's claims fail to meet the pleading requirements of the PSLRA and the claims against Defendants must be dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion to dismiss Plaintiff's first amended complaint is **GRANTED**. (Doc. No. 26).

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 29th day of May, 2013.